IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JOHN M. LALLI,<br><br>  Plaintiff,<br><br>vs.<br><br>THE HARTFORD INSURANCE COMPANY,<br><br>  Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 1:10-cv-00152<br><br>Judge Dee Benson |

Before the Court is Plaintiff John M. Lalli's ("Plaintiff") Motion for Summary Judgment or Judgment on the Administrative Record, and Defendant Hartford Life and Accident Insurance Company's ("Defendant") Cross-Motion for Summary Judgment. Both motions are made pursuant to Rule 56 of the Federal Rules of Civil Procedure. The underlying issue in the case is whether Defendant's decision to revoke Plaintiff's long-term disability insurance benefits was reasonable under an arbitrary and capricious standard of review.

1

## I. FINDINGS OF FACT

### A. Plaintiff's History

Plaintiff's disability insurance benefits were revoked by Defendant in February 2010 on the ground that Plaintiff was no longer disabled. (Pl.'s Mem. Supp. Mot. Summ. J. 6 (Dkt. No.17)). It is the reasonability of that decision that is at the heart of the present controversy.

Plaintiff is a sixty-year-old man who spent his entire professional life in the insurance industry. (Pl.'s Mem. Supp. Mot. Summ. J. 3 (Dkt. No.17)). Throughout his thirty-year career, Plaintiff started up, owned, operated, sold, and re-opened multiple health insurance brokerages. *Id.* at 3-4. His insurance brokerages insured major auto dealers, manufacturers, and large businesses in Utah, Nevada, and Arizona. *Id.* at 3. Plaintiff was the recipient of numerous awards including recognition in the Regents Blue Cross and Blue Shield President's Club, and accolades as the top producer for Intermountain Healthcare and Educator's Mutual. *Id.* at 4.

Plaintiff accepted an offer from Van Gilder Insurance Company in 2000 to work as a "producer." (Pl.'s Mem. Supp. Mot. Summ. J. 4 (Dkt. No.17)). Plaintiff's job was to produce new business for Van Gilder, and to assist account executives and other support staff in retaining previously produced business. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 6 (Dkt. No. 20)). As an employee of Van Gilder, Plaintiff participated in the Van Gilder Corporation Group Disability Insurance Plan issued by Defendant ("the Plan"). *Id.* at 4. The Plan was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff worked for Van Gilder for six years. *Id.* at 2.

In May 2006, Plaintiff was hospitalized with pneumonia. *Id.* at 7. While in the hospital,

his medical providers found a "lung mass." *Id.* Plaintiff spent approximately a week in the hospital, received a battery of tests, and was subsequently diagnosed with Chronic Fatigue Syndrome, Epstein Barr Virus ("EBV"), Valley Fever, and Fibromyalgia. (Pl.'s Mem. Supp. Mot. Summ. J. 4 (Dkt. No.17)). The symptoms that accompanied his diagnosis were documented by Plaintiff's treating physician, Dr. Sam Wilson, as cough, fatigue, insomnia, fevers, chills, sweats, and pneumonia. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 7,8 (Dkt. No. 20)). As a result of his physical condition, Plaintiff resigned from Van Gilder in June 2006.

In the years following his diagnosis, Plaintiff was unable to return to the physical or mental condition he had previously enjoyed. For instance, in March 2009, Dr Wilson wrote, "[Plaintiff] is a patient of mine who suffers from Chronic Fatigue Syndrome, Uncontrollable Hypertension, and Valley Fever. He is unable to work more than [three] days a week for [three] hours a day. He gets extremely fatigued very quickly and cannot physically handle a stress load." (Pl.'s Mem. Supp. Mot. Summ. J. 4 (Dkt. No.17)).

In addition, Dr. John Whitaker, a specialist who treated Plaintiff twelve times beginning in May 2008, stated in a lengthy report in February 2010 that his treatments had "served to improve [Plaintiff's] pain and fatigue," but the treatments did not "reverse the course of his illness, but only serve[d] to give him a relative few hours of respite." *Id.* at 5. Notably, Dr. Whitaker prescribed mild exercise for Plaintiff, including golf. *Id.* at 4. Dr. Whitaker also reported:

> [Plaintiff] has had occasion to visit me and at first during the visit, he is alert and interactive, participating in his own care plan and avidly involved in the conversation. Then typically, as the hour grows late, he begins quickly to fade. I see his eyes lose focus, he loses track of

> the conversational flow, and has to ask repeatedly what we are talking about. His speech literally begins to slur a bit and his eyes droop and he asks to finish the visit so he can go rest. On these occasions I have had to make arrangements for him to have a ride home. This has happened regularly and frequently enough that I now ask him to have someone bring him to the visits, and we have shortened our visit time to prevent overtiring him.
>
> It is clear to me that [Plaintiff] would not be able to work at this time on the basis of cognitive dysfunction alone, even without taking into consideration his pain and fatigue, which are considerable.

*Id.* at 6.

### B. Plaintiff's Receipt of Disability Benefits

Plaintiff received short-term disability benefits from Defendant from June 24, 2006 through September 22, 2006. *Id.* at 7. In conjunction with Plaintiff's short-term disability claim, Dr. Wilson submitted an Attending Physician Statement ("APS") indicating a primary diagnosis of pneumonia and a growth in the lung, with a secondary diagnosis of EBV and Valley Fever. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 7 (Dkt. No. 20)). Dr. Wilson also stated that Plaintiff was unable to do the following activities for greater than forty-five minutes: standing, walking, sitting, lifting/carrying, reaching/working overhead, pushing, pulling, and driving. *Id.* Dr. Wilson also stated his belief that Plaintiff would be disabled for approximately three months. *Id.* In a second APS dated August 8, 2006, Dr. Wilson diagnosed Plaintiff with Valley Fever and EBV and re-estimated that Plaintiff should be able to return to work in December 2006. *Id.* at 8.

After fulfilling its obligation under Plaintiff's short-term plan, Defendant then approved Plaintiff's long-term disability claim on September 18. 2006. *Id.* Plaintiff informed Defendant on November 17, 2006 that because of his persistent fatigue he would not recover by the December 2006 date that Dr. Wilson had predicted. *Id.* Between 2006 and 2009, Plaintiff

underwent numerous tests, but his condition improved little.  *See id.* at 10-11.  Defendant paid Plaintiff disability benefits for over three years, until February 12, 2010.  *Id.* at 16.

## C.  Defendant Denies Plaintiff's Disability Benefits

Pursuant to the terms of the Plan, Defendant required Plaintiff to provide continuing proof that he meets the definition of "disabled."  (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 2 (Dkt. No. 20)).  The Plan initially defined disabled as the inability to perform "one or more of the essential duties" of Plaintiff's *own occupation*.  (Def.'s Reply Supp. Mot. Summ. J. 10 (Dkt. No. 33) (emphasis added)).  However, after thirty-six months – in Plaintiff's case, in August 2009 – the definition of disability changed to require Plaintiff to prove that he was unable to perform "one or more of the essential duties" of *any occupation* for which he was qualified.  *Id.* (emphasis added).

Defendant commenced six non-consecutive days of surveillance on Plaintiff in August and September 2009.  Because of what appeared to be discrepancies between Plaintiff's activity in the surveillance and Plaintiff's reported limitations, Defendant employed Barry R. Berger, an investigator for Defendant, to conduct an in-person interview with Plaintiff in Plaintiff's home.  (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 35 (Dkt. No. 20)).

Defendant also sent letters to three of Plaintiff's physicians inquiring whether, based on the information observed in the surveillance, Plaintiff was capable of working up to forty hours a week.  *Id.* at 17.  Only Dr. Greg Hammond responded to Defendant's inquiry.  *Id.* at 17.  Dr. Hammond responded that based on the surveillance Plaintiff did appear to be able to work forty hours a week but also pointed out that the severity of Plaintiff's fatigue was "difficult to quantify

. . . by just an office visit." (Pl.'s Reply Supp. Summ. J. 16 (Dkt. No. 30)).

Finally, Defendant employed David S. Knapp, M.D., board certified in internal medicine with a sub-specialty in rheumatology, to perform an Independent Medical Review ("IMR") of Plaintiff's claim. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 3 (Dkt. No. 20)). Dr. Knapp reviewed Plaintiff's medical records and had phone conversations with Dr. Wilson and Dr. Whitaker. *Id.* at 16. Dr. Knapp did not perform a physical evaluation of Plaintiff. (Mot. Summ. J. Hr'g Tr. 30, Nov. 18, 2011). Dr. Knapp concluded that no restrictions or limitations were supported by Plaintiff's medical file or by his telephonic consultations with Drs. Wilson and Whitaker. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 16 (Dkt. No. 20)).

Based on this investigation, Defendant determined that Plaintiff was capable of performing his own occupation, and, concomitantly, that he no longer met the definition of disabled under the Plan. *Id.* at 3. Accordingly, Defendant denied Plaintiff's long-term disability benefits beyond February 12, 2010. *Id.*

Plaintiff appealed Defendant's denial of benefits in April 2010. *Id.* at 18. In response to Plaintiff's appeal, Defendant re-analyzed Plaintiff's claim, reviewed multiple letters sent on Plaintiff's behalf reiterating Plaintiff's disabled condition, and also performed two additional IMRs on Plaintiff's claim: one by Ara Dikranian, M.D., board certified in rheumatology, and another by Nick Defilippis, Ph.D., board certified in psychology and neuropsychology. *Id.* at 3, 27. Dr. Dirkranian and Dr. Defilippis reviewed Plaintiff's medical file and held telephone conversations with Dr. Whitaker, but, as with Dr. Knapp, neither Dr. Dirkranian nor Dr. Defilippis personally performed a physical evaluation of Plaintiff. *Id.* at 18.

Defendant upheld its decision to deny Plaintiff's benefits in July 2010. *Id.* at 20. Defendant determined that Plaintiff's claim file demonstrated that Plaintiff was not only capable of performing the essential duties of his own occupation, but he was able to perform the essential duties of any occupation. *Id.* Having exhausted his appeals process, Plaintiff initiated this lawsuit.

## II. STANDARD OF REVIEW

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). A court considering summary judgment should consider the evidence in the light most favorable to the non-moving party. *See, e.g. Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004).

### B. Employee Retirement Income Security Act

The United States Supreme Court has articulated the appropriate standard of review in an ERISA case involving denied benefits: "Consistent with established principles . . . we hold that a denial of benefits under [ERISA] is to be reviewed under a *de novo* standard, unless the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989).

"[I]f the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms," *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998) (citing *Firestone*, 489 U.S. at 115), then a court "applies an 'arbitrary and capricious' standard to a plan administrator's actions." *Id*.  The court's "responsibility lay in determining whether the administrator's actions were arbitrary and capricious, not in determining whether [the claimant] was, in the district court's view, entitled to disability benefits."  *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992).

The Supreme Court has ruled that a conflict of interest exists in cases where a professional insurance company is both the plan administrator and the claims payor. *Metropolitan Life Ins. Co. v. Glen*, 554 U.S. 105 (2008).  In these instances, this conflict should be "weighed as a 'factor in determining whether there is an abuse of discretion,'" on the part of the insurance company.  *Id.* at 115 (citing *Firestone*, 489 U.S. at 115).  In weighing the importance to be placed on the conflict of interest, the Supreme Court advised that a conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ."  *Metropolitan Life Ins. Co.*, 554 U.S. at 117.

### III. ANALYSIS

#### A. The Arbitrary and Capricious Standard

##### 1. The Arbitrary and Capricious Standard Applies and a Conflict of Interest Exists

Both parties concede that the Plan gave Defendant discretionary authority to determine eligibility for benefits and to construe and interpret the terms of the insurance plan. (Pl.'s Mem. Supp. Mot. Summ. J. 11 (Dkt. No.17)); Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 32 (Dkt. No. 20)). Consequently, the Court will utilize the arbitrary and capricious standard to weigh the reasonableness of Defendant's decision. *See, e.g. Charter Canyon Treatment Ctr.,* 153 F.3d at 1135. In addition, both parties agree that Defendant acts as both insurer and plan administrator; thus, a conflict of interest exists that the Court will weigh as a factor in determining whether Defendant's decision was arbitrary and capricious. *Metropolitan Life Ins. Co.*, 554 U.S. at 117.

##### 2. Weight of the Conflict of Interest

Defendant contends that because the Tenth Circuit Court of Appeals in *Holcomb* gave the conflict of interest factor very limited weight based on the insurer's use of two independent physicians to review the claim, this Court should give the conflict of interest factor very little weight because Defendant employed three independent medical experts to review Plaintiff's case. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 33 (Dkt. No. 20)); *Holcomb v. UNUM Life Ins. Co. of America*, 578 F.3d 1187 (10th Cir. 2009). The Court finds Defendant's reliance on *Holcomb* to be in error.

One of the independent physicians in *Holcomb* personally examined the insured, a fact that is conspicuously absent in Plaintiff's case. *See infra* p.10; *Holcomb*, 578 F.3d at 1193.

Defendant stated that a logistical problem prevented a medical expert from personally examining Plaintiff.  (Mot. Summ. J. Hr'g Tr. 30, Nov. 18, 2011).  As discussed *infra*, given the subjective nature of Plaintiff's diagnosis, without a personal examination from a doctor the Court cannot say, as the court ruled in *Holcomb*, that Defendant diligently endeavored to discover the nature of Plaintiff's ailments.  *Holcomb*, 578 F.3d at 1193.  Nor can the Court say that Defendant took "active steps" to promote accuracy.  *Metropolitan Life Ins. Co.*, 554 U.S. at 117.  Consequently, the Court will view the conflict of interest factor with increased importance in this case.  *See id.*

**B.  Defendant's Decision was Arbitrary and Capricious**

    **1.  Plaintiff's Diagnosis was Subjective in Nature and Plaintiff's Behavior Changed**

The Court continues its analysis with the oft-repeated lament of other courts that the conditions affecting Plaintiff, especially Fibromyalgia and Chronic Fatigue Syndrome, are problematic for insurers and courts evaluating disability claims because proving the diseases is difficult given the subjective nature of the symptoms.  *See* Welch v. UNUM at 1086, 87 (citing *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999) ("Because proving the disease is difficult . . . fibromyalgia presents a conundrum for insurers and courts evaluating disability claims").  *Compare Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) ("[F]ibromyalagia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective."); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (noting that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . . but the amount of pain and fatigue that a particular case of it produces cannot be");

with *Boardman v. Prudential Ins. Co. Of Am.*, 337 F.3d 9, 16 n. 15 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrom and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis").

In addition, the Court also notes that Plaintiff's behavior following his hospitalization is antithetical to his behavior prior to his hospitalization. *See* Pl.'s Mem. Supp. Mot. Summ. J. 3-6 (Dkt. No.17). The record demonstrates that Plaintiff was not a man prone to torpidity during his long career prior to 2006. *Id.* Rather, as one who alternatively owned, expanded, sold, and restarted his own insurance brokerages throughout multiple states since 1976, Plaintiff demonstrated traits of the proverbial overachiever. *Id.* The record reflects a man whose behavior changed dramatically following the diagnosis of diseases that are highly subjective in nature.

With this background in mind, and in light of the evidence evaluated against the administrative record as a whole, *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2009), the Court is unpersuaded that the steps taken by Defendant – viewed individually or collectively – demonstrate that Defendant's decision to deny long-term disability benefits to Plaintiff was "predicated on a reasoned basis." *Rizzi v. Hartford Life and Ac. Ins. Co.*, 2010 WL 2473858, 383 Fed. Appx. 738 (10th Cir.) (*unpublished opinion*).

### 2. Defendant's Reliance on Plaintiff's Medical Records

Defendant emphasizes that it "employed three separate, independent medical reviews [on Plaintiff's claim] by two medical doctors and one neuropsychologist" who each concluded that

"Plaintiff does not have restrictions and limitations precluding him from full-time employment," to demonstrate the reasonableness of its decision. (Def.'s Reply Supp. Mot. Summ. J. 6 (Dkt. No. 33)). While there is nothing "inherently objectionable about a file review by . . . qualified physician[s] in the context of a benefits determination," *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), given the subjective nature of Plaintiff's diagnosis and his dramatically changed work behavior post-hospitalization, the Court finds that Defendant's reliance on mere reviews of Plaintiff's medical file to be inadequate for two reasons. *See id.* First, the review of the medical records was not followed by a physical examination of Plaintiff; and second, Defendant relied on medical records that Defendant admitted were inconclusive.

### a. No Physical Examination

The Court recognizes that physical examinations are not requisite in all cases for an insurer's decision to be reasonable. *See* Mot. Summ. J. Hr'g Tr. 30, Nov. 18, 2011. But the Court also considers Defendant's decision to conduct file reviews rather than a physical examination as another factor in the overall assessment of whether Defendant acted reasonably. *Calvert*, 409 F.3d at 295. In *Calvert*, the Sixth Circuit Court of Appeals stated, "while we find that [Defendant's] reliance on a file review does not, standing alone, require the conclusion that [Defendant] acted improperly, we find that the failure to conduct a physical examination . . . may, in some cases raise questions about the thoroughness and accuracy of the benefits determination." *Id.* The Court finds this reasoning applicable to the current case.

Defendant stated at the hearing that the reasons a medical doctor did not personally examine Plaintiff was: (1) a logistical problem because Defendant's medical doctor was in New

Jersey and the Plaintiff resides in Utah; and (2) Defendant sent an investigator, Mr. Berger, to meet with Plaintiff to conduct an in-person interview. (Mot. Summ. J. Hr'g Tr. 30-31, Nov. 18, 2011). Defendant's position is unreasonable.

First, given the subjective nature of Plaintiff's diagnosis, especially when viewed alongside the dramatic shift in Plaintiff's work behavior, a file review without a personal examination raises questions about the thoroughness and accuracy of Defendant's benefits determination. *Calvert*, 409 F.3d at 295. This is especially true when the determination is premised on a "logistical" decision. (Mot. Summ. J. Hr'g Tr. 30-31, Nov. 18, 2011). A logistical decision implies that it would have been inconvenient to Defendant – not to Plaintiff – for a medical expert to examine Plaintiff in Utah. Such behavior exemplifies self-interested decision-making, *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n. 4 (6th Cir. 2000); it does not demonstrate a commitment to an accurate determination by Defendant.

Second, Mr. Berger, who conducted the in-person interview of Plaintiff, was an investigator *for* Defendant – he was not an independent investigator. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 14 (Dkt. No. 20)); *see also* Mot. Summ. J. Hr'g Tr. 31, Nov. 18, 2011. Moreover, Mr. Berger was not a medical doctor; he did not have the medical expertise to review Plaintiff's condition as would a medical expert performing a physical examination. Under such facts, "the potential for self-interested decision-making is evident." *Univ. Hosps. of Cleveland*, 202 F.3d at 846 n. 4. Ultimately, the issue is not whether a medical doctor acting on behalf of Defendant would have come to the same conclusion as Mr. Berger that Plaintiff was not disabled (had there been a physical examination); rather, the Court must only determine whether it was

reasonable for Defendant to deny Plaintiff's benefits without a personal medical evaluation in this instance. And in this case, the Court finds it was unreasonable.

### b. Inconclusive Medical Records

In support of its decision to deny benefits, Defendant argues that "Plaintiff's medical records are inconclusive regarding [Plaintiff's] claimed disability." (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 35 (Dkt. No. 20)). Defendant maintains that Plaintiff's medical records – which include an MRI and several evaluations and tests – do not fully support the alleged impairments asserted by Dr. Whitaker. *Id.* Specifically, Defendant writes, "although [Plaintiff's] Attending Physician, Dr. Whitaker, continued to support that [Plaintiff] was unable to work in any capacity, the file documentation does not support Dr. Whitaker's position." (Def.'s Reply Supp. Mot. Summ. J. 8 (Dkt. No. 33). Under these circumstances, the Court finds *Gaylor v. Hancock*, 112 F. 3d 460 (10th Cir. 1997) instructive.

In *Gaylor,* the Tenth Circuit found that although no particular physical condition was "verified by the use of clinical and laboratory diagnostic techniques," *Id.* at 467, an insured was entitled to long-term disability benefits because both of the insured's treating physicians agreed that the insured suffered from a disabling condition. *Id.* In so ruling, the Tenth Circuit held that a court should not disregard the "great weight" of evidence provided by doctors who physically examine an insured simply because "objective laboratory diagnostic findings . . . are inconclusive." *Id*. Moreover, the court stated that "these doctors did not use a crystal ball to conclude that [the insured] was disabled; their opinions were based on clinical physical examinations." *Id.*

In this case, Dr. Whitaker, like the doctors in *Gaylor*, based his opinion on clinical physical evaluations. (Pl.'s Mem. Supp. Mot. Summ. J. 4 (Dkt. No.17)). Moreover, Dr. Whitaker was clear that while Plaintiff was able to maintain some levels of activity, "[Plaintiff] [was] not able to increase that level of activity . . . and may never be able to do so." (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 35 (Dkt. No. 20)). While the Court recognizes that ERISA plan administrators are not required to give special deference to the opinions of treating physicians over other credible opinions and materials, *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the Court also views Dr. Whitaker's diagnosis as further evidence of Plaintiff's physical condition. Because the Court will not disregard the weight of the evidence provided by Dr. Whitaker, the Court finds that Defendant's decision to deny Plaintiff benefits on an inconclusive medical record, without a physical examination, when Plaintiff's treating physician based his opinion on a physical examination to be unreasonable.

**3. Defendant's Reliance on Video Surveillance**

**a. Video Surveillance: Days 1-5**

Defendant used video surveillance of Plaintiff on six separate days in 2009: August 14, 15, 22, 23, and September 9 and 10. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 13 (Dkt. No. 20)). It is notable that on two of the days, August 14 and 22, Plaintiff "was not observed away from the residence." *Id.* at 12. Thus, for a full one-third of the days that Plaintiff was observed, he did not leave his home.

On three of the four days Plaintiff was observed outside of the home, Plaintiff was observed performing mundane tasks: e.g, "walking," "sitting," "standing," "carrying mail,"

"opening doors," "operating a vehicle," "drinking a beverage," and "conversing." *Id.* at 13. Defendant alleges that these activities do not match with Plaintiff's reported limitations. *Id.* at 36. Defendant's allegations are exaggerated. Neither Plaintiff nor his doctors suggested that Plaintiff is completely incapacitated. (Pl.'s Reply Supp. Summ. J. 12 (Dkt. No. 30)). Moreover, none of these tasks give strong evidence of Plaintiff's ability to maintain a full-time job, especially since on those three days, Plaintiff was seen away from his home for only four, three, and three-and-a-half hours, respectively. (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 12-13 (Dkt. No. 20)). In addition, two of the days that Plaintiff was observed out of his home, August 15 and 23, followed days where Plaintiff never left his home at all. *Id.*

It is also noteworthy that Defendant previously found Plaintiff to be disabled when it paid Defendant short-term benefits for three months and long-term benefits for over three years. *Id.* at 16. Yet, all that the first five days of surveillance demonstrate is that Plaintiff's condition changed very little, if at all. Had Defendant wanted to make a reasonable determination that Plaintiff's disabled condition improved, it needed to do so based on more solid evidence than what the surveillance demonstrated over these five days.

### b. Video Surveillance: Day 6

On September 10, the most controversial day of surveillance, Plaintiff was observed away from his home for approximately eight hours. *Id.* at 13. During that time he was seen golfing for four-and-a-half hours, and driving his car. *Id.* at 36. Plaintiff was also observed performing more mundane activities such as "bending at the waist," "retrieving a pair of shoes," "standing," and "conversing," among other similar activities. *Id.* Defendant argues that this

evidence "contradicts Dr. Whitaker's opinion regarding Plaintiff's abilities," and aids in justifying its decision to deny Plaintiff benefits. (Def.'s Reply Supp. Mot. Summ. J. 14 (Dkt. No. 33)). Defendant's position is not reasonable.

The Court finds that the video surveillance of Plaintiff golfing did not reveal new and substantial information regarding Plaintiff's abilities to justify Defendant's decision to deny Plaintiff benefits. *See Morgan v. UNUM Life Ins. Co. of America*, 346 F.3d 1173, 1177-78 (8th Cir. 2003) (holding that an insurance company's surveillance – "showing [the insured] driving his car, eating lunch at a restaurant, carrying light obstacles, sitting and reading, and stretching and doing light aerobic exercise at the gym for about forty-five minutes" to reveal nothing new and was not substantial evidence supporting the insurance company's decision to discontinue benefits to an insured). Dr. Whitaker opined that Plaintiff "would not be able to play more than nine holes [of golf] over 2-1/2 hours." (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 20 (Dkt. No. 20)). On this singular day, Plaintiff golfed for two hours longer than Dr. Whitaker predicted. *Id.* at 36. Two additional hours of golf on one of six days is not substantial information regarding Plaintiff's ability to maintain a full time job. It is not uncommon for people to conceal disabilities or weaknesses while affiliating with family, friends or business associates, as was the case here. Moreover, four-and-a-half hours of golf might have been slightly longer than Dr. Whitaker predicted, but it does not equate to a full, eight-hour workday. More importantly, however, Dr. Whitaker prescribed golf as a part of Plaintiff's treatment. (Pl.'s Reply Supp. Summ. J. 12 (Dkt. No. 30)).

Finally, the Court was not given any evidence regarding Plaintiff's condition following

Plaintiff's four hours of golfing.  If, as Defendant alleges, Plaintiff's golfing contradicts Plaintiff's self-reports of exhaustion following mild exercise, (Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. 35 (Dkt. No. 20)), the Court would have appreciated seeing evidence – such as further surveillance – that Plaintiff was not exhausted after golfing.  Indeed, Plaintiff contends that he pays quite a price for exerting himself for such a long period of time.  He claims that when he golfs he is "down for the next two days." *Id.* at 14.  This is consistent with Dr. Whitaker's report that even mild exercise leaves Plaintiff exhausted.  (Pl.'s Reply Supp. Summ. J. 12 (Dkt. No. 30)).

Given that on two days of surveillance Plaintiff never left the house, on three days Plaintiff was seen performing merely mundane tasks, and that the four hours of golf on one day did not reveal substantial information to Defendant, the Court does not find Defendant's decision to deny Plaintiff benefits based on the limited information it gleaned in the surveillance to be reasonable.

### 4.  Public Policy

Finally, in light of the facts of this case, the Court is hesitant to rule in a manner that would dissuade insured individuals receiving long-term disability benefits from leaving their homes for fear of losing their benefits.  The Court is cognizant of individuals, who, like Plaintiff, are disabled, but are not entirely incapacitated.  The Court does not want to inhibit these individuals, who, in trying to improve their condition, or based on advice from their doctor, are engaged in similar activities that Plaintiff performed.

## IV.  CONCLUSION

Based on the analysis above, the Court finds that there is no genuine dispute as to a material fact that Defendant's decision to deny Plaintiff long-term disability benefits was unreasonable and, thus, arbitrary and capricious.  Plaintiff's Motion for Summary Judgment is GRANTED.  Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

DATED this 23rd day of February, 2012.

*[signature]*

Dee Benson
United States District Judge